# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

ADRIANA MERMAN, :
                 :
        Plaintiff, :
                 :
    v.           :
                 :
CITY OF CAMDEN, CITY OF CAMDEN :
POLICE DEPARTMENT, BUDDY CAMP, :
and JOHN DOE CITY OF CAMDEN :
POLICE OFFICERS 1-10 :
(fictitious names), :
                 :
        Defendants, :

---

Civil Action No.
07-cv-3449 (NLH)(KMW)

**OPINION**

**APPEARANCES**:

Talbot B. Kramer, Jr., Esquire
Freidel & Kramer, PC
151 Fries Mill Road, Suite 404
Turnersville, NJ 08012
*Attorney for Plaintiff Adriana Merman*

Mark M. Cieslewicz, Esquire
Office of the City Attorney
City Hall
4th Floor, Suite 419
P.O. Box 915120
Camden, NJ 08101
*Attorney for Defendants City of Camden, City of Camden Police
Department, and Buddy Camp*

**HILLMAN, District Judge**

Plaintiff, Adriana Merman, alleges that defendants, the City
of Camden ("City" or "Camden"), the City of Camden Police

Department, and Buddy Camp,[1] violated her constitutional and common law rights when she was physically injured and unlawfully detained by Camden police officers following a concert. In response to plaintiff's complaint, defendants have filed a Motion for Summary Judgment. Subsequently, plaintiff has filed a Motion to Amend the Complaint.

For the reasons expressed below, and as set forth in the Court's Oral Opinion issued on April 22, 2010, defendants' Motion for Summary Judgment is granted in part and denied in part. Further, plaintiff's Motion to Amend is granted.

## I.    JURISDICTION

Plaintiff has brought federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as claims under New Jersey law. This Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

## II.   BACKGROUND[2]

---

[1] Plaintiff also names as defendants "John Doe City of Camden Police Officers," a fictitious name for those unknown police officers who allegedly harmed her.

[2] The following facts are derived from plaintiff's complaints, plaintiff's deposition testimony and affidavit, and the deposition testimonies of Bryant Kidd, John Frett, Jr., Buddy Camp, and Sergeant Jeffrey Frett. Given that the present matter comes before the Court by way of defendants' Motion for Summary Judgment, plaintiff's evidence "is to be believed and all justifiable inferences are to be drawn in [her] favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

On July 19, 2005, plaintiff attended a concert event known as "Ozzfest" at the Tweeter Entertainment Center in Camden, New Jersey.[3]  After the concert, plaintiff gathered in a parking lot near the venue with her uncle, Bryant Kidd, Kidd's niece, Jennifer Frett, Kidd's nephew, John Frett, Jr., and Ricky Lopez, a friend of John Frett.  They began to prepare food using a small grill.  During this time, a Camden police officer informed plaintiff and her companions that he had to close the parking lot and that they would have to leave.  The group asked if they could continue to cook with their grill on the sidewalk outside of the parking lot.  The officer did not object.  Plaintiff and her companions complied and left the lot and relocated to the sidewalk.  Kidd drove his vehicle out of the lot and parked in the nearby street alongside the curb.

While the group was occupying the sidewalk area, a police vehicle pulled up towards the group.  One of the officers inside the vehicle told the group that they had to leave the area.  An officer then exited the car and began to converse with Lopez.  Soon thereafter, Officer Buddy Camp[4] parked his vehicle nearby

---

[3] Over the years, the venue formerly known as the Tweeter Entertainment Center has been renamed multiple times and is currently called the Susquehanna Bank Center.  For the sake of simplicity and clarity, the Court will continue to refer to the venue as the Tweeter Entertainment Center.

[4] Camp was a Camden police officer at the time of this incident, but left the force in 2005.

3

and also confronted the group.  Officer Camp appeared agitated and swore profanities at the group, directing them to leave the area.  As plaintiff and her companions prepared to leave, Officer Camp picked up the grill and tossed it several feet toward plaintiff.[5]  The grill did not hit plaintiff, but, according to her deposition testimony, it was "very close" to her.[6]  Plaintiff became scared.

Around this time, several more police officers arrived, in vehicles, at the scene.  Plaintiff joined Kidd and Jennifer and John Frett inside Kidd's car.  She observed between eight to thirteen officers, some of whom were frisking Lopez.[7] Thereafter, Lopez returned to Kidd's car.[8]  The officers first directed everyone to exit the vehicle and then told everyone to

_____

[5] In his deposition, Camp testified that he did not recall, on the night in question, exiting his vehicle, having any confrontations with anyone or one involving a grill, arresting anyone, or observing any other officers make an arrest.

[6] In her complaint, plaintiff alleges that Camp and/or another officer "violently kicked the grill."  She testified in her deposition, however, that Camp picked up and tossed the grill.  During his deposition, John Frett also testified that an officer had picked up and thrown the grill.

[7] Kidd corroborated plaintiff's testimony, stating in his deposition that about "a dozen" officers arrived on the scene. At his deposition, John Frett estimated that there were between seven and twenty officers at the scene.

[8] Kidd testified in his deposition that an "altercation" occurred between Lopez and John Frett and the officers, and that the officers pushed Lopez against a fence.  According to Kidd, Lopez never entered Kidd's car but either left the scene on his own accord or was arrested.

wait inside it.  While plaintiff and her companions were inside the vehicle, an officer opened the car's door suddenly, pulled Lopez out, and threw him to the ground where the officers kicked him.  The officers also grabbed Jennifer Frett and pulled her from the car.  Both Lopez and Frett were handcuffed.[9]

Following their detention, another officer opened the car's rear passenger side door and asked plaintiff to exit.  Plaintiff asked what she had done.  In response, the officer pulled plaintiff from the car and threw her forcefully to the ground. Plaintiff's face hit the ground, causing it to throb and bleed.[10] While lying on the ground, plaintiff's legs were held down and she felt a knee in her back.  Plaintiff was handcuffed and brought back to her feet.  She overheard laughter among the officers, as well as, what she deemed, "racial slurs," particularly "yuppies" and "cracker."[11]

---

[9] Sergeant Jeffrey Frett was one of the officers at the scene of the incident.  Although he is a relative of Jennifer and John Frett, Sergeant Frett testified in his deposition that he does not know their family well and did not know of their familial relations at the time of the incident.  Additionally, Sergeant Frett recalled that during the altercation, Jennifer Frett and another woman, presumably plaintiff, were both non-compliant and defiant of police orders to leave the premises, instead arguing and verbally jostling with the officers.

[10] In her complaint, plaintiff averred that Camp dragged her from Kidd's vehicle and beat her.  However, in her deposition, she denied that Camp was the officer who removed her from the car and that any officer actually hit her.

[11] Although she admitted that she could not describe the officer who pulled her from Kidd's vehicle, plaintiff testified

Plaintiff, Jennifer Frett, and Lopez were transported to the Camden police headquarters in different police vehicles.  The officers who drove plaintiff to the police station were not Caucasians.  Upon arriving at the police department, officers escorted plaintiff to a room where she was handcuffed to a chair.[12]  Plaintiff denies that she was ever placed in a holding cell.  Eventually, an officer led plaintiff to an office where she met with another man.  The man explained to plaintiff that she was being detained because she had been uncooperative and because an officer thought that she had kicked or tripped him during the interaction at Kidd's vehicle.

After her meeting, plaintiff returned to the room where she was previously seated.  At different times, she observed and spoke with both Frett and Lopez, who were also being held in the police station.  Plaintiff, Frett, and Lopez were detained until approximately 3:30 a.m. or 4:00 a.m. on the morning of July 20, 2005, at which time they were released.  Plaintiff reported that, as a result of the encounter with the police, she had suffered injuries to her head, jaw, back, knees, and right arm and shoulder.

In June 2007, plaintiff filed a complaint in the Superior

that she believed he was either African-American or Hispanic.

[12] In her deposition, plaintiff adds that an officer eventually removed the handcuffs.

Court of New Jersey against the City, the Camden Police
Department, and several unknown Camden police officers, alleging
violations of her constitutional and common law rights.  About a
month later, on July 25, 2007, the City and the Camden Police
Department removed the suit from the Superior Court to this
Court.  Plaintiff subsequently filed an amended complaint, on
January 4, 2008, identifying Camp as one of the officers involved
in the alleged incident and naming him as a defendant.

The amended complaint avers many of the same allegations and
the same five counts as articulated in the original complaint.[13]
In particular, plaintiff alleges that Camp and the other unnamed
officers violated her constitutional rights through their use of
excessive force and false arrest, wrongfully imprisoned her,
assaulted and battered her, and negligently caused bodily harm to
her.[14]  In addition, plaintiff alleges that the City violated her

---

[13] Since defendants filed their Motion for Summary Judgment,
plaintiff moved for leave to file a second amended complaint.  On
March 12, 2010, the Magistrate Judge granted plaintiff's motion.
Plaintiff filed her second amended complaint on March 14, 2010.
Except for two additional causes of action -- 1) negligent loss
of or failure to retain records, and 2) intentional destruction
of or fraudulent concealment of records and evidence -- the
second amended complaint appears to set forth the same
allegations and claims as the previous complaints.  Because this
current complaint does not substantively alter plaintiff's
preexisting claims or defendants' arguments for summary judgment,
the Court will address defendants' Motion for Summary Judgment at
this time.

[14] Further, plaintiff alleges that Camp and the other
officers acted as agents, employees, and servants of the City and
the Camden Police Department, and that the City is therefore

constitutional rights of due process under the Federal
Constitution "by failing to adequately safeguard, supervise,
train or otherwise monitor its police officers so as to prevent
them from committing acts which violated the Constitutional
Rights of the public."  Further, plaintiff states that the
actions of the City and its police department "amounted to
deliberate indifference for the rights of the public in the City
of Camden."

On February 19, 2010, defendants filed a Motion for Summary
Judgment.  The Court heard oral argument relating to defendants'
motion on April 22, 2010.  At the hearing, the Court denied
defendants' motion with regard to plaintiff's Section 1983 claim
against the City.  However, the Court found that plaintiff had
not sufficiently pled a Section 1983 claim against Camp under the
theory of bystander liability.  The Court granted the parties
leave to further brief the issue.  Thus, on April 29, 2010,
plaintiff moved to amend her complaint, seeking to add a cause of
action against Camp under the theory of bystander liability.

The Court now submits its Written Opinion in connection to
defendants' Motion for Summary Judgment[15] and addresses
plaintiff's Motion to Amend the Complaint.

---

liable pursuant to the doctrine of <u>respondeat</u> <u>superior</u>.

[15] At oral argument, the Court expressed its intention to
supplement its Oral Opinion with a written one.

**III. DISCUSSION**

    **A.**    **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the

nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## B.   City of Camden Police Department

In her complaint, plaintiff names the Camden Police Department as a defendant in addition to the City.  Defendants' counsel correctly posits, however, that the Police Department is not a proper defendant in this Section 1983 case.  See Padilla v. Twp. of Cherry Hill, 110 F. App'x. 272, 278 (3d Cir. 2004) ("In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." (citation and internal quotation marks omitted)); see also Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability."); N.J.S.A. 40A:14-118 (declaring that New Jersey police departments are "an executive

and enforcement function of municipal government"). At oral argument, plaintiff's counsel conceded that the Camden Police Department should be dismissed from this suit.

Therefore, for the reasons stated at oral argument and in this Opinion, the City of Camden Police Department is dismissed as a party in this action.

**C.   Section 1983 Claim Against City of Camden**

Defendants argue that plaintiff cannot sustain a Section 1983 claim against the City because she cannot demonstrate any municipal policies or customs that caused the alleged harms borne by plaintiff as a result of officers' misconduct. In particular, defendants assert that plaintiff has not conducted or gathered any discovery that would demonstrate a municipal policy or custom, and moreover, plaintiff fails to proffer any evidence that could directly attribute the officers' alleged misconduct to such a policy or custom.[16]

Plaintiff rests the City's municipal liability on two theories. First, plaintiff counters that she has established a prima facie cause of action under Section 1983 by virtue of the massive number of reported incidents alleging excessive force and

---

[16] The entirety of defendants' argument against this Section 1983 claim was presented in defendants' brief in support of its Motion for Summary Judgment. After plaintiff submitted her opposition brief, defendants did not file a reply. Moreover, at oral argument, defendants' counsel informed the Court that defendants would rely on their written submission and offered no further argument on the issue.

other constitutional violations against the City's officers and of the City's alleged policy or custom of failing to adequately investigate civilian complaints or supervise and discipline its officers.  In support of her argument, plaintiff has provided statistical data and copies of reports generated by the City's Office of Internal Affairs ("Internal Affairs"), documenting the findings of civilian complaints against officers for excessive force and other misconduct.  According to plaintiff, these reports and memoranda demonstrate that, despite escalating numbers of such complaints, the City routinely and arbitrarily dismisses the complaints without finding any culpability on behalf of its officers and, thus, condones its officers' use of excessive force in discharging their duties, without any threat of discipline.  Plaintiff concludes that the City's failure to adequately investigate civilian complaints or to supervise or discipline its officers directly caused the unconstitutional treatment plaintiff suffered at the hands of the City's officers in July 2005.

Second, plaintiff alleges that the City maintains no formal policy to create, preserve, or protect records for all arrests and detentions that its officers effectuate.  The City's failure to utilize an official policy and safeguards, plaintiff surmises, tacitly encourages and approves officer misconduct, allowing officers to violate constitutional rights without any threat that

12

they may be later identified or held accountable for their actions.  To illustrate her point, plaintiff points to the fact that no records documenting her detention or those of Jennifer Frett or Ricky Lopez can be found by the City.[17]  The Court will address each of plaintiff's Section 1983 theories in turn.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.[18]  In this case, plaintiff alleges that the

---

[17] In her complaint, plaintiff bases her Section 1983 claim for municipal liability on the City's failure to "adequately safeguard, supervise, train or otherwise monitor its police officers so as to prevent them from committing acts which violated the Constitutional Rights of the public."  It appears that plaintiff intends this averment to encapsulate her claims of deliberate indifference against the City on account of its failure to adequately investigate and discipline its officers' use of excessive force and its lack of a formal policy for documenting arrests and detentions.  The Court accepts plaintiff's articulation for purposes of setting forth her claims.

[18] At the outset of her complaint, plaintiff mentions that she seeks to address violations of her civil rights as protected by "the Constitution of the United States, the Constitution of the State of New Jersey and various State statutes."  When enunciating this Section 1983 cause of action, however, plaintiff only references the United States Constitution, the Fourteenth Amendment to the United States Constitution, and Section 1983; she does not cite to the New Jersey Constitution or any of its provisions.  Nonetheless, defendant would appear to acknowledge

City violated her constitutional rights.  A municipality,
however, cannot be held liable under Section 1983 for the actions
of its agents or employees under a theory of respondeat superior.
Groman v. City of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).
Rather, "[w]hen a suit against a municipality is based on § 1983,
the municipality can only be liable when the alleged
constitutional transgression implements or executes a policy,
regulation or decision officially adopted by the governing body
or informally adopted by custom."  Beck v. City of Pittsburgh, 89
F.3d 966, 971 (3d Cir. 1996) (citing Monell v. New York City
Dept. of Social Servs., 436 U.S. 658 (1978)).

Accordingly, under Section 1983, a municipality may be
liable for either its policy or custom:

> A government policy or custom can be
> established in two ways.  Policy is made when
> a decisionmaker possessing final authority to
> establish a municipal policy with respect to
> the action issues an official proclamation,
> policy, or edict.  A course of conduct is
> considered to be a "custom" when, though not
> authorized by law, such practices of state
> officials are so permanently and well-settled
> as to virtually constitute law.

McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009)
(citations, quotation marks, and brackets omitted).  "Custom

------

that, generally speaking, any New Jersey constitutional claims
are governed by the same standards as their federal counterparts.
Accordingly, for present purposes, the Court will allow plaintiff
to proceed on the basis of the State Constitution for any federal
constitutional claim remaining, without prejudice to a separate
motion brought by the defendants challenging such claims.

requires proof of knowledge and acquiescence by the decisionmaker." Id.  Additionally, "[a] plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injuries suffered." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  To do so, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Id. (citations omitted).  "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Id. at 851.

With regard to the City's investigatory processes, plaintiff does not point to an explicit or affirmative policy.  Instead, she alleges that the City condoned and perpetuated a custom or practice of inadequate investigations of civilian complaints and insufficient supervision and discipline of its officers, which, in turn, suggested tacit approval of and encouragement for its officers' unconstitutional misconduct.  "A custom of failing to investigate citizen complaints may provide a basis for municipal liability if 'a policy-maker (1) had notice that a constitutional violation was likely to occur, and (2) acted with deliberate indifference to the risk.'" Brice v. City of York, 528 F. Supp. 2d 504, 518 (M.D. Pa. 2007) (quoting Hernandez v. Borough of

Palisades Park Police Dep't, 58 F. App'x 909, 912 (3d Cir. 2003)); see Groman, 47 F.3d at 637 ("This deliberate indifference standard applies to plaintiffs' allegations of negligent supervision and failure to investigate."); see also Tobin v. Badamo, 78 F. App'x 217, 219 (3d Cir. 2003) ("A municipality may be held liable under section 1983 when its failure to supervise police officers reflects a policy of deliberate indifference to constitutional rights.").

The seminal case concerning the failure to investigate civilian complaints in the Third Circuit is Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996). In Beck, the plaintiff alleged that an officer, Anthony Williams, used excessive force against him while making an arrest and that the municipality tacitly authorized such excessive force. Id. at 967. After the plaintiff presented his case to a jury, the District Court granted defendant's motion for judgment as a matter of law, finding that the plaintiff failed to proffer sufficient evidence to show that the municipality had established a policy or custom condoning officer misconduct. Id. On appeal, the Third Circuit reversed, holding that plaintiff had "presented sufficient evidence from which a reasonable jury could have inferred that the City of Pittsburgh knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." Id. at 976.

In support of his claim, the plaintiff offered into evidence several investigative reports conducted by the municipality's investigative agency in connection with civilian complaints, including the plaintiff's own, against Officer Williams for the use of excessive force.  Id. at 969-70.  None of the complaints were sustained or resulted in discipline for Officer Williams. Id. at 970.  In addition, the plaintiff presented the testimony of municipal officials who explained that the municipality treats each complaint against an officer as an independent event and does not consider an officer's history of prior, unsustained complaints when evaluating a pending one.  Id. at 969.  Finally, the plaintiff also introduced a municipal report that contained statistical information regarding excessive force complaints and acknowledged the department's problems with excessive force and its remedial procedures.  Id. at 970, 975.

Reversing the District Court, the Third Circuit found that the municipality's investigatory system was "sterile and shallow" and that each complaint against Officer Williams "was insulated from other prior and similar complaints and treated in a vacuum." Id. at 973.  The Third Circuit found significant the systemic unfairness and danger in crediting an officer's testimony more favorably than that of the complainant or other witnesses and the failure to consider prior complaints as relevant to the assessment of a current complaint.  Id. at 973-74.  Further, the

plaintiff suggested the flaws inherent in the municipality's investigative processes, the Third Circuit opined, through the municipality's own report and the testimony of one of its own officials, both of which highlighted the system's deficiencies and described an increase in excessive force complaints yet relatively few disciplinary actions.  Id. at 975.

In this case, plaintiff furnishes copies of Internal Affairs' statistical summaries for each year between 1999 and 2005.  Based on those summaries, Internal Affairs received more than four hundred and seventy (470) complaints of excessive force and approximately sixty (60) complaints of improper arrest during that period of time –- particularly disturbing, says plaintiff, because at that time the Camden Police Department employed only about four hundred (400) police officers.  Further, the number of complaints increased over the course of time.[19]  In two of the excessive force cases, an officer was found to have violated departmental rules and was internally disciplined.  None of the other complaints alleging excessive force or improper arrest resulted in any criminal or departmental sanctions.[20]

---

[19] There were forty-eight (48) civilian complaints alleging excessive force filed in 1999.  Between 2000 and 2003, the number of excessive force complaints averaged about fifty-seven (57) per year.  In 2004 and 2005, the number of complaints rose to one hundred and two (102) and ninety-six (96), respectively.

[20] It is important to note that by the end of 2005, one hundred and fifty-nine (159) of the excessive force cases and twenty-two (22) of the improper arrest cases were still pending.

Given the sheer number of civilian complaints in relation to the number of officers, and the pattern of escalation over the years, the significance of plaintiff's quantitative evidence is, unquestionably, substantial and greatly informs this Court's decision.  See D'Arrigo v. Gloucester City, 2007 U.S. Dist. LEXIS 44316, at *47 (D.N.J. Jun. 19, 2007) (denying municipality's motion for summary judgment and finding that "a reasonable jury could find that the City has a policy or custom of ignoring unconstitutional excessive force in the police department" because plaintiff adduced evidence "showing that in twenty five years, no officer has been fired for a disciplinary reason" and the members of the police department admitted that "they have no knowledge or recollection of an internal investigation of a complaint of excessive force that resulted in a finding of excessive force").

Isolated and without further context, however, statistical evidence alone may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers.  See Strauss v. City of Chicago, 760 F.2d 765, 768-69 (7th Cir. 1985) (finding statistics alone insufficient to prove municipal liability because "[p]eople may file a complaint for many reasons, or for no reason at all").  "Rather than reciting a number of complaints or offenses, a

_____

The ultimate resolution of those cases is unclear on the record.

Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." <u>Brown v. New Hanover Twp. Police Dep't</u>, 2008 U.S. Dist. LEXIS 71434, at *44 (E.D. Pa. Sept. 22, 2008); <u>see</u> <u>Mariani v. City of Pittsburgh</u>, 624 F. Supp. 506, 511 (W.D. Pa. 1986) (same).

To bolster the weight of her statistical evidence, and to contextualize the numbers, plaintiff sets forth a sample of approximately forty (40) reports from Internal Affairs relating to civilian complaints alleging officers' use of excessive force and other constitutional violations during the years 1999 to 2005. <u>See</u> <u>Torres v. Kuzniasz</u>, 936 F. Supp. 1201, 1206 (D.N.J. 1996) (stating that "documentation of civilian complaints and the police department's resultant investigations are relevant and necessary to the plaintiff's burden of establishing the requisite policy or custom and causation required for municipal liability under § 1983" (citing <u>Beck</u>, 89 F.3d 966)). Because plaintiff cannot identify any of the officers who allegedly abused or detained her, she -- unlike the plaintiff in <u>Beck</u> -- cannot focus upon a particular officer's prior history of complaints and alleged misconduct to help prove her case.[21]  Instead, plaintiff

---

[21] Plaintiff's inability to identify the officers who allegedly violated her rights is not entirely uncommon, as illustrated by several civilian complaints proffered by plaintiff.  That the City does not maintain an official policy to document the arrests and detentions of citizens certainly may

explains in her opposition to the present motion that, as evinced by its memoranda, Internal Affairs relies on any perceived weaknesses in a complaint to find in favor of the officer and against the complainant.

The Court has reviewed the extensive Internal Affairs' records submitted by plaintiff.  Were the complainants' allegations accepted as true, virtually all of the civilian complaints addressed in those reports would sufficiently allege constitutional violations, specifically the rampant use of excessive force.  Moreover, plaintiff accurately explains that in many of the reports, Internal Affairs credits the officers' versions of events over those of the complainants or their witnesses, or concludes that, given the discrepancy in the accounts and the dearth of witnesses or other evidence, no finding of misconduct can be made.  Oftentimes, the reports' conclusions of "unfounded," "not sustained," "exonerated," or "administratively closed" are predicated seemingly upon officers' corroborating the account of other officers, complainants' inabilities to identify the offending officer or witnesses who may support their own accounts,[22] the fact that complainants were

_____

contribute to and exacerbate this severe problem.  The Court will more thoroughly address this issue, <u>infra</u>.

[22] The Court finds it particularly disturbing that in one incident the file was closed because the complainant could not identify a potentially corroborating witness under circumstances where it was clear that the identity of the witness would have

charged with or were guilty of an offense, and the decisions of the county prosecutor's office not to pursue criminal cases against the officers.  Also, the reports rarely mention or consider an officer's past history of civilian complaints when evaluating the veracity of a current complaint.[23]

In Beck, as explained above, the Third Circuit found a genuine issue of material fact relating to the adequacy of an investigatory system, and to the existence of an unconstitutional custom or practice, due to similar features as those present in this case.  See Beck, 89 F.3d at 973 (noting that, in addressing civilian complaints, the investigative agency did not consider prior or similar complaints against an officer, assumed the credibility of the officer's testimony, discounted the credibility of witnesses who accompanied the complainant, and "[i]n the absence of testimony by witnesses having no connection with the alleged incident, [the agency] ultimately resolved almost all complaints against [the officers] on the narrow testimony of the complainant and the accused officer, thereby

_____

been known to another officer on the scene.  The file reveals no effort to locate the second officer, identify the witness, and interview him.  Yet the file reflects the failure of the complainant to identify the witness as the primary reason the file was closed.  This is precisely the kind of shallow investigation condemned in Beck.

[23] By the Court's count, no more than two or three of the reports explicitly referenced an officer's history of prior complaints.

disposing of them unfavorably for the complaining citizen"). Based on the evidence presented by plaintiff and any testimony or argument she may offer on the subject, a jury is entirely capable of evaluating the statistics and memoranda, the civilian complaints, and the allegations set forth in this case and deciding for itself whether a municipal policy or custom existed.[24]   See id. at 975-76 ("As for drawing inferences from

---

[24] In Monaco v. City of Camden, 2008 U.S. Dist. LEXIS 30825 (D.N.J. Apr. 14, 2008), the Court also noted, and considered significant, the similarities between the deficient investigatory process in Beck and the investigatory process employed by the City of Camden as illustrated in that case.   See id. at **38-39. In particular, the Court explained:

> Indeed, it is noteworthy that the investigatory process at issue in Beck was similar to that employed by the Police Department in this case.   Like the City of Camden Police Department's investigation processes, the municipal defendant in Beck "investigate[d] each complaint against an officer for use of excessive force, and decide[d] whether the complaint [was] 'unfounded,' 'exonerated,' 'not sustained,' 'sustained,' or 'closed by memo.'" Beck, 89 F.3d at 968.   As in this case, the plaintiff in Beck contended that under the system employed by the municipality, a "finding of 'not sustained' [would inevitably result] whenever [the municipality was] faced with only the complainant's word against the officer's word," which allegedly resulted in an inadequate process for assessing whether officers had in fact used excessive force. Id. at 969.   The Court of Appeals made clear in Beck that a jury could assess the adequacy of such a system without the benefit of expert testimony.   Id. at 975-76.

Monaco, 2008 U.S. Dist. LEXIS 30825, at **38-39.

the evidence regarding the adequacy of the investigatory process,
we again agree with [the plaintiff] that . . . '[i]t is not
beyond the ken of an average juror to assess what a reasonable
municipal policymaker would have done with the information in
this case.'"").  By the jury's assessment, Internal Affairs'
investigations and subsequent conclusions may be valid and just,
or, instead, they may fortify the facade of a superficial
investigatory process that, either by design or application,
shields officer misconduct.  Under these circumstances, a jury is
the proper entity to decide.

Further, plaintiff highlights approximately ten civilian
complaints arising from alleged police abuse and brutality
occurring at the Tweeter Entertainment Center around the time of
concert events.  This series of complaints ("Tweeter complaints")
shows that the type of officer misconduct plaintiff alleges is
not unusual or unknown to the City, but rather may be emblematic
of a pattern of alleged officer misconduct, both generally and in
the context of a particular venue at particular times.  By and
large, the factual circumstances and allegations surrounding
plaintiff's case and the Tweeter complaints are strikingly
similar.  In about four of the Tweeter complaints, officers
purportedly strong-armed and bullied concert-goers who did not
abide by the officers' orders to leave the area immediately.  In
about seven of the cases, officers forcibly hurled someone to the

24

ground or assaulted that person while he or she lied on the ground or was in custody.  In addition, one complainant observed officers kicking concert-goers' coolers and grills, directing those people to leave the parking lots.  Other complainants, in two distinct instances, were handcuffed, thrown into a police van, and driven a short distance before being released onto a street or a parking lot.  All of the complainants alleged the use of excessive force.  Nevertheless, for the reasons explained above, all but one of the complaints were dismissed.[25]

As told by reviewing all of the complaints, including the Tweeter complaints, allegations of excessive force against Camden police officers ranged from forcefully detaining and slapping individuals to punching and beating them with batons.  Taken as a whole, the civilian complaints and Internal Affairs' investigations and resolutions show that plaintiff's allegations are consistent with prior allegations and that when investigating civilian complaints, Internal Affairs employs processes and reasoning that may, in the eyes of a reasonable fact-finder, insulate officers from liability.

Moreover, plaintiff has sufficiently demonstrated a

---

[25] In one of these cases, the officer was administratively charged for physically assaulting a complainant who was handcuffed and in custody.  The Internal Affairs investigator recommended that no such charge was warranted, but was informed that the County Prosecutor and Chief of Police requested the charge.

"'plausible nexus' or 'affirmative link'" between the City's alleged custom of inadequate investigations, supervision, and discipline and the alleged deprivation of her constitutional rights in this case.  <u>Bielevicz</u>, 915 F.2d at 850 (citations omitted); <u>see</u> <u>Monaco v. City of Camden</u>, 2008 U.S. Dist. LEXIS 30825, at *34 (D.N.J. Apr. 14, 2008) ("[I]f, as Plaintiff argues, the City failed to conduct adequate investigations into excessive force complaints, then a heightened inclination of police officers to use excessive force would be a 'highly predictable consequence' of the City's inaction." (quoting <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 409 (1997))). Were a jury to credit plaintiff's proofs that the City inadequately investigated its officers' alleged use of excessive force and other constitutional violations and failed to properly supervise or discipline its officers, a reasonable fact-finder could, in turn, conclude that the City's action, or lack thereof, constituted deliberate indifference and proximately caused plaintiff's injuries.  <u>See</u> <u>Monaco</u>, 2008 U.S. Dist. LEXIS 30825, at *35 ("Plaintiff's evidence, if credited by the jury, establishes that the City conducted untimely and/or inadequate investigations into complaints that its officers committed serious civil rights violations.  A reasonable jury could infer a causal connection between this municipal custom and the injuries Plaintiff suffered.").

26

Again, the Court cannot say whether the City's handling of civilian complaints and its conclusions are patently unfair, wholly inaccurate or specious, or aimed at shielding its officers from accountability.  However, there is sufficient evidence from which the jury may draw these conclusions, and plaintiff should be able to present her case.  Needless to say, the jury is free to find that the opposite is true –- that the City's investigatory process is adequate, did not constitute deliberate indifference toward foreseeable constitutional violations, and/or did not proximately cause plaintiff's injuries.  Either way, a genuine issue of material fact exists, and the Court cannot find as a matter of law that the City is not liable for its alleged policy or custom.[26]

The Court reaches the same conclusion on plaintiff's other Section 1983 allegations against the City based on the alleged lack of a formal, written policy and safeguards relating to the documentation of arrestees and detainees at police headquarters. In combination with the widespread accusations of nefarious police misconduct, the lack of record-keeping policies and

---

[26] Plaintiff will bear the burden at trial to prove the elements of the Section 1983 claim for municipal liability against the City, along with her other causes of action.  The Court does not opine on the merits of plaintiff's claims or her likelihood of success on each element.  In this Opinion, the Court merely concludes that it cannot rule against plaintiff's Section 1983 claim against the City as a matter of law at this stage of litigation.

safeguards is deeply troubling and problematic, as exemplified by plaintiff's alleged ordeal in this case.

As part of discovery, plaintiff requested from the City its standard operating procedures for booking procedures for non-indictable offenses.  In response, plaintiff received a document decreeing a "General Order" for the City's officers concerning "Handling of Juvenile & Adult Prisoners in Holding Cells" ("General Order").  The General Order does not expressly require that any records be generated whenever an individual is arrested or detained by police.  The import of the General Order and the lack of any policies, according to plaintiff, is the absence of express safeguards to ensure that officers document their encounters with citizens and any arrests or detentions that they effectuate.  By virtue of this systemic shortcoming, plaintiff surmises, officers may abuse their authority without fear of consequence, whether in the form of civilian complaints and internal discipline or civil rights suits.  Additionally, plaintiff also points to the deposition testimony of Sergeant Dieter Tunstall in which he could not identify any safeguards ensuring that all arrests and detentions were adequately recorded.[27]

---

[27] Sergeant Tunstall testified that "it's not a given" that a record is created whenever a person is brought to police headquarters in handcuffs.  He elaborated that a person brought into headquarters for questioning with the Detective Bureau would not necessarily warrant a record of his or her presence.

The Court agrees with plaintiff that in the absence of any formal policy mandating rules, procedures, and guidelines for documenting arrests and lengthy detentions and preserving those records, a police officer may unlawfully seize an individual without fear of reprisal, knowing that the individual will have no records by which to identify the officer and to help redress any mistreatment.  Accepting plaintiff's allegations as true and drawing all favorable inferences therefrom, as this Court is obliged to do, this case perfectly, and disturbingly, illustrates the dangers inherent in the lack of formal policies and safeguards concerning the documentation of arrests and lengthy detentions.

Here, plaintiff, Jennifer Frett, and Ricky Lopez were physically restrained, placed in handcuffs, and taken to police headquarters.  According to Sergeant Frett, Jennifer Frett was even issued a summons for a disorderly persons offense. Plaintiff and her companions were held at the station until approximately 3:30 a.m. in the morning before being released on

-------

However, when asked if he was "familiar with any ways that a person could be brought in not for questioning by someone in the Detective Bureau where there would not be a record of their presence in this building," Sergeant Tunstall replied, "No, I'm not aware of that."  He later answered affirmatively that a "face sheet," containing a person's general information, is generated whenever someone arrives at the police's "Central Complaint."  It is not clear, however, whether any other information is obtained and whether the arresting or detaining officer is identified in any records.

the street, hours after they had encountered the officers.  The
City, nevertheless, acknowledges that it cannot find any records
or documents relating to plaintiff, Frett, or Lopez on the night
in question, and as a result, plaintiff cannot identify any of
the officers who allegedly abused or detained her.[28]

Although a pattern of unconstitutional action is generally
required to prove municipal liability, "a constitutional
violation may be such a 'known and obvious' or 'highly
predictable consequence' of an ongoing course of action that
knowledge of past violations is unnecessary."  Hernandez, 58 F.
App'x at 913 (citing Berg v. County of Allegheny, 219 F.3d 261,
276 (3d Cir. 2000)); see Bryan County, 520 U.S. at 409-10 ("[A]

---

[28] On December 28, 2005, a clerk from the Camden Police
Department responded to plaintiff's request for documentation
relating to her detention in July 2005.  The clerk notified
plaintiff that the department was "[u]nable to locate" the
records she requested.  Further, in response to an interrogatory
asking, "Is there any record of the Plaintiff being present in
Police Headquarters of the City of Camden at any time on July
19th or July 20, 2005?", the City answered: "No record of
Adriana Merman being present in police headquarters on July 19-
20, 2005 has been located.  A search of the records for these
dates is ongoing."  Finally, in a letter dated February 5, 2010,
defendants' counsel informed plaintiff's counsel that he had
requested "Face Sheets, all Arrest Cards, and printouts of all
computer data created/entered by Central Complaint" in connection
with plaintiff and her companions on the night in question.
Based on his inquiry with the "Records and Identification section
of the Police Department," defendants' counsel reported that
"[t]here does not appear to be any record of your client or her
companions having gone through Central Complaint on the date of
this incident."  Defendants' counsel added that the "Records
unit" also told him that "they had no record of a Ricky Lopez in
their system."

high degree of predictability may also support an inference of
causation –– that the municipality's indifference led directly to
the very consequence that was so predictable.").  The absence of
an official, express policy mandating and guaranteeing the
requisite process for documenting arrests and lengthy detentions
amounting to de facto arrests unnecessarily and dangerously
obfuscates governmental conduct which, by its very nature,
deprives citizens of their liberty and freedom.  To entrust
themselves to law enforcement and the rule of law, citizens
demand, and are entitled to, a reasonable degree of transparency
and order.  Without a policy memorializing arrests and lengthy
detentions in an official and consistent manner, and guaranteeing
compliance with that policy, the police may, at best, invite
confusion and distrust and, at worst, whitewash illegal activity
perpetrated upon a vulnerable population who will have no means
for redress.  Consequently, police misconduct and the inability
of citizens to advance legitimate complaints against Camden
police officers are known and obvious, and highly predictable,
consequences of a municipality which does not maintain an express
policy for documenting arrests and lengthy detentions and a
mechanism to ensure compliance with such a policy.  Certainly,
this must be clear to the City of Camden, whose officers, as seen
in plaintiff's proofs, are subject to an enormous number of
civilian complaints by virtue of their interactions with the

community, its denizens, and visitors.[29]

As demonstrated under the circumstances of this case, the absence of a formal policy detailing the procedures for documenting and maintaining records of arrests and lengthy detentions may lead to the deprivation of citizens' constitutional rights and the inability to remedy them.  See A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 583 (3d Cir. 2004) (holding that "a reasonable jury could infer that the failure to establish [a written policy and procedure for reviewing and following up on incident reports] was causally related to the constitutional violations of which [the

---

[29] The Court hastens to make clear that it reads plaintiff's Section 1983 allegations comprehensively.  As such, the Court does not mean to suggest that a municipality is necessarily subject to a Section 1983 claim simply because its police department lacks express, official policies governing the documentation of arrests and lengthy detentions.  Rather, in this case plaintiff's allegations state a viable cause of action, and withstand defendants' Motion for Summary Judgment, because of the unique totality of circumstances attendant to this particular action.  Here, plaintiff has successfully presented a Section 1983 claim against the City on account of its alleged custom of inadequately investigating civilian complaints and inadequately disciplining and supervising its officers.  Because of the ramifications of this alleged custom and the City's inability to produce any records documenting the stationhouse detentions of plaintiff and her companions, the City's lack of a record-keeping policy is more striking and significant.  But, again, it is the combination of, and interrelation between, the City's alleged acquiescence to and tacit endorsement of unconstitutional police action and the lack of documental policies and safeguards that animate plaintiff's claims here.  In that regard, the Court need not address whether the City's alleged lack of a record-keeping policy and its safeguards, standing alone, would sustain a Section 1983 claim.

plaintiff] complains").

For the reasons stated above, and in this Court's Oral Opinion issued on April 22, 2010, defendants' Motion for Summary Judgment in relation to plaintiff's Section 1983 claim against the City is denied.[30]

**D.   State Law Claims Against City of Camden**

Defendants contend that any state law claims against the City must be dismissed because, pursuant to the New Jersey Tort Claims Act, the City does not bear liability for any intentional or willful misconduct committed by its employees.  By defendants' account, plaintiff's allegations against the City's officers are

---

[30] Plaintiff contends that she need not identify a particular municipal decision-maker in order to advance her Section 1983 claim against the City.  Nevertheless, plaintiff points to the Chief of Police, who delegates his authority to investigators who act as his direct representatives when investigating civilian complaints.  Although plaintiff may have done better in articulating this portion of her claim, the Court agrees that a reasonable fact-finder could conclude that the Chief of Police knew or should have known of the inadequate investigations and record-keeping at issue in this case.  See Hernandez, 58 F. App'x at 913 ("A reasonable fact-finder may conclude that a Police Chief has constructive knowledge of constitutional violations where they are repeatedly reported in writing to the Police Department." (citing Beck, 89 F.3d at 973)); Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st Cir. 1989) ("Constructive knowledge 'may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them.'" (quoting Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987))).  In any event, the Court finds that a genuine issue of material fact exists, thereby justifying the denial of defendants' Motion for Summary Judgment.  Plaintiff will bear the burden of proving all elements of her Section 1983 cause of action, and her other claims, at trial.

predicated upon intentional wrongdoing, for which the City is not responsible.  Further, plaintiff's claim for negligence, says defendants, is not tethered to any evidence presented in this case.

In response, plaintiff focuses on her cause of action for wrongful imprisonment.  A municipality may be liable for wrongful imprisonment or analogous claims, plaintiff posits, where it is unclear whether the officers acted willfully and maliciously or perhaps in good faith.  Plaintiff states that her arrest and subsequent detention falls somewhere in the midst of this spectrum of uncertainty, between willful misconduct and good faith action.  Hence, plaintiff submits that the Tort Claims Act should not bar her wrongful imprisonment claim against the City on the basis of respondeat superior.

Pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq., "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances."  N.J.S.A. 59:2-2(a); see N.J.S.A. 59:3-3 (stating that, although "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law," the good faith exception does not "exonerate[] a public employee from liability for false arrest or false imprisonment").  However, "[a] public entity is

not liable for the acts or omissions of a public employee
constituting a crime, actual fraud, actual malice, or willful
misconduct."  N.J.S.A. 59:2-10; see Linden v. Spagnola, 2002 U.S.
Dist. LEXIS 14573, at *42 (D.N.J. Jun. 27, 2002) ("N.J.S.A. 59:2-
10 creates municipal immunity for intentional public employee
misconduct.").

First of all, plaintiff does not dispute that her claims for
use of excessive force and assault and battery amount to
intentional torts.  In fact, in her opposition to defendants'
Motion for Summary Judgment, plaintiff concedes that "it is
difficult to argue that the excessive use of force by the
officers involved was conduct that would not be willful
misconduct under section 2-10 of the Tort Claims Act."
Accordingly, those claims asserted against the City are barred by
the Act and, thus, are dismissed.

Second, plaintiff asserts that her wrongful imprisonment
claim survives the City's statutory immunity because that claim
does not hinge upon an officer's state of mind and may have been
perpetrated by misconduct that was not intentional, willful, or
malicious.  The Court agrees.

"False imprisonment is the constraint of the person without
legal justification."  Leang v. Jersey City Bd. of Educ., 969
A.2d 1097, 1117 (N.J. 2009) (citation and internal quotation
marks omitted).  "The tort of false imprisonment has two

35

elements: (1) an arrest or detention of the person against his or her will; and (2) lack of proper legal authority or legal justification." Id. (citation and internal quotation marks omitted). To commit the tort, an officer need not act in bad faith or with intentional or willful disregard of a person's rights; rather, the officer may falsely imprison a person through mere negligence. See Adams v. City of Camden, 461 F. Supp. 2d 263, 270 (D.N.J. 2006) (finding that because false imprisonment does "not require that the officer has any particular state of mind, there is no per se ban [imposed by the Tort Claims Act] on this action against the municipality"); Maurello v. U.S., 111 F. Supp. 2d 475, 482 n.9 (D.N.J. 2000) ("To allege a cause of action for false imprisonment, it matters not whether the defendant acted with malice or bad faith; a person will be liable for false imprisonment even if he negligently believes that his confining of plaintiff is justified.").

For those reasons, in Adams, this Court denied a motion for summary judgment seeking to dismiss claims of false arrest and false imprisonment on the basis of the Tort Claim Act's proscriptions. See Adams, 461 F. Supp. 2d at 270-71. The Court read the plaintiff's complaint liberally and concluded that "the alleged 'unlawful' actions of [the officer] could fall somewhere in the zone between good faith and willful misconduct." Id. at 270. Because a genuine issue of material fact existed as to the

36

arresting officer's state of mind at the time when he detained and arrested the plaintiff, the plaintiff's claims were allowed to proceed.  Id. at 270-71.

Similarly, in this case, plaintiff's proofs if believed by the jury would support an inference that any wrongful imprisonment may not have been necessarily intentional or wrongful.  As such, the Court refrains from categorically barring plaintiff's wrongful imprisonment claim as a matter of law at this stage of litigation.  Ultimately, if plaintiff pursues her claim under the sole theory of intentional misconduct, defendants may then seek to oust it.  Under the circumstances, however, it remains a potentially viable cause of action.

Finally, the Court refuses to dismiss plaintiff's claim for negligent infliction of bodily harm.  Plaintiff's own testimony indicates that officers grabbed her and pulled her from the vehicle and forcibly threw her to the ground.  While these alleged actions may support an intentional tort, plaintiff is free to argue in the alternative, and a jury would be free to accept, that any injuries suffered by plaintiff were caused by the officers' negligent use of force.  No other grounds for dismissal have been proffered by defendants.

Therefore, defendants' Motion for Summary Judgment is granted with regard to plaintiff's state law claims against the City, based on vicarious liability, for use of excessive force

37

and assault and battery.  However, defendants' motion is denied
with regard to plaintiff's claims against the City for wrongful
imprisonment and negligent infliction of bodily harm.[31]

**E.  State Law Claims Against Buddy Camp**

Defendants argue that no evidence adduced in this suit
supports plaintiff's allegations that Camp employed excessive
force against her, that he physically assaulted and battered her,
or that he detained or confined her unlawfully.  The only
evidence presented against Camp, explain defendants, is
plaintiff's own testimony that Camp picked up and heaved the
grill on the sidewalk, which, in and of itself, is insufficient
to save any of her claims.[32]  In her Opposition to the Motion for

---

[31] In their Motion for Summary Judgment, defendants also
explain that plaintiff's claim of respondeat superior does not
set forth an actual cause of action, but "merely reasserts
plaintiff's claim that the City of Camden is responsible for the
actions of its unidentified police officers."  The Court agrees.
See Allia v. Target Corp., 2008 U.S. Dist. LEXIS 29591, at **17-
18 (D.N.J. Apr. 10, 2008).  Therefore, to the extent plaintiff
alleges respondeat superior as a separate cause of action, it is
simply redundant and dismissed.

[32] In defendants' Motion for Summary Judgment, the following
caption appears before the only section of the brief addressing
plaintiff's claims against Camp: "NO EVIDENCE IN THIS CASE
SUPPORTS THE ALLEGATIONS IN PLAINTIFF'S COMPLAINT THAT BUDDY CAMP
ACTED TO VIOLATE PLAINTIFF'[S] CONSTITUTIONAL RIGHTS."  Although
the caption focuses on plaintiff's Section 1983 claim against
Camp, defendants assert in their brief that "[a] review of [the
deposition] testimony reveals no information to support any claim
against defendant Buddy Camp."  More specifically, defendants
also submit:  "No evidence has been presented to support any of
the allegations made in the Complaint that Buddy Camp used
excessive force against the plaintiff, physically dragged
plaintiff out of the vehicle, threw her to the ground, beat, hit,

Summary Judgment, plaintiff concedes that Camp "is neither the officer who threw her to the ground, nor is he the officer who personally detained her."

The Court finds that the evidence submitted in this case, primarily in the form of deposition testimony, does not support plaintiff's state law claims against Camp for wrongful imprisonment or negligent bodily injury.  Based on testimony and reasonable inferences drawn therefrom, Camp swore at and admonished plaintiff and her companions, and he picked up and threw a grill toward plaintiff, which did not contact her.  At no time, however, did Camp actually touch or detain plaintiff.  In her deposition testimony, plaintiff acknowledges that Camp was not one of the officers who pulled her from Kidd's car, put her into the police vehicle, or drove her to police headquarters.

Therefore, for the reasons stated above, defendants' Motion for Summary Judgment is granted insofar as plaintiff's state law claims against Camp for wrongful imprisonment and negligent cause of bodily injury are hereby dismissed.[33]

---

kicked and otherwise injured her, or detained and confined plaintiff for a number of hours at the police station." Accordingly, based on these assertions, the Court finds no reason not to address the viability of plaintiff's state law claims against Camp as well.

[33] Plaintiff also alleges that Camp committed assault and battery against her.  Neither party addresses this particular claim in their briefs, and without some argument from defendants, the Court cannot determine as a matter of law the viability of this claim.  Thus, the claim of assault and battery against Camp

**F.   Plaintiff's Motion to Amend the Complaint**

As previously mentioned, during a hearing held on April 22, 2010, the Court agreed with defendants' counsel that, on its face, plaintiff's complaint did not sufficiently allege a Section 1983 claim for bystander liability against Camp.  The Court offered both parties the opportunity to submit briefs to determine whether or not plaintiff should be able to proceed against Camp under the theory of bystander liability.

Plaintiff now moves to amend her complaint to include a claim against Camp under the theory of bystander liability.  In support of her request, plaintiff asserts that, as illustrated by her deposition testimony, Camp was present at the time that other officers violated her rights, and though he had the opportunity, Camp did not intervene or otherwise protect her.  Although her prior complaints may not have adequately set forth her claim for bystander liability, plaintiff opines, they did put Camp on notice of his potential liability for assisting other officers in violation of plaintiff's civil rights.  Conversely, defendants contend that plaintiff has proffered no evidence to support her claim that Camp violated her rights, and that to allow plaintiff to amend her complaint at this late date would prejudice Camp and necessitate more discovery.

Federal Rule of Civil Procedure 15(a)(2) provides that "a

remains.

party may amend its pleading only with the opposing party's
written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).
"The court should freely give leave when justice so requires."
Id.  "If the underlying facts or circumstances relied upon by a
plaintiff may be a proper subject of relief, [s]he ought to be
afforded an opportunity to test h[er] claim on the merits."
Foman v. Davis, 371 U.S. 178, 182 (1962).  Therefore, leave
should generally be granted absent "undue delay, bad faith or
dilatory motive on the part of the movant, repeated failure to
cure deficiencies by amendments previously allowed, undue
prejudice to the opposing party by virtue of allowance of the
amendment, [or] futility of amendment."  Id.

The Court does not find, nor do defendants suggest, that by
moving to amend her complaint, plaintiff is causing undue delay
or acting in bad faith or with a dilatory motive.  Defendants'
primary contention is that there is simply no evidence to support
plaintiff's new claim.

Courts have held that a police officer has a duty to take
reasonable steps to protect a victim from another officer's use
of excessive force, even if the excessive force is employed by a
superior.  "'If a police officer, whether supervisory or not,
fails or refuses to intervene when a constitutional violation
such as an unprovoked beating takes place in his presence, the
officer is directly liable under Section 1983.'"  Smith v.

Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002) (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)) (other citations omitted).  In order to establish a claim for bystander liability for the actions of a fellow officer, a plaintiff must establish that the officer "observe[d] or had reason to know: (1) that excessive force [was] being used; (2) that a citizen was being unjustifiably arrested; or (3) that any constitutional violation [was being] committed by a law enforcement official."  Herrera v. City of New Brunswick, 2008 U.S. Dist. LEXIS 7532, at *29 (D.N.J. Feb. 1, 2008) (citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).  An officer is only liable, however, if there is a realistic and reasonable opportunity to intervene.  Smith, 293 F.3d at 651.

Here, the encounter between plaintiff, her companions, and the officers, including Camp, is disputed, and the issue of whether any of the officers acted unlawfully is a question of fact requiring jury determination.  Thus, bystander liability cannot be determined if the issue of excessive force or detention cannot be determined.  Further, if the situation is viewed in the light most favorable to plaintiff, there is sufficient evidence from which a reasonable jury could conclude that Camp was present, was aware of the other officers' actions, and did nothing to help plaintiff.  During her deposition, plaintiff testified that Camp arrived on the scene, swore at plaintiff and

42

her companions, and threw the grill.  Other officers arrived and
detained Jennifer Frett and Ricky Lopez.  After Frett and Lopez
had been pulled from Kidd's car and handcuffed, the same happened
to plaintiff.  Through their deposition testimony, plaintiff,
Kidd, and John Frett all corroborate the purported fact that
several officers were present at the scene during the alleged
altercation.

        Although no testimony implicates Camp in the actual use of
excessive force or the unlawful detention, a jury could credit
plaintiff's testimony and reasonably infer that Camp remained at
the scene, observed the unconstitutional actions of other
officers, and chose not to intervene.  On the other hand, a jury
may find that, even if police misconduct occurred, Camp was not
present at the time or in a position to intervene on plaintiff's
behalf.  Either way, the ultimate resolution of fact is entrusted
to the jury.  After all, "[w]hether [an officer] had sufficient
time to intercede or was capable of preventing the harm being
caused by another officer is an issue of fact for the jury,
unless considering all the evidence, a reasonable jury could not
possibly conclude otherwise."  Herrera, 2008 U.S. Dist. LEXIS
7532, at *29 (citing Anderson, 17 F.3d at 557).  Consequently,
the Court cannot conclude at this time that permitting plaintiff
to amend her complaint would be futile.

        Moreover, the Court does not believe that the specter of

43

reopening discovery warrants denial of plaintiff's request for leave to amend.  As plaintiff mentions in support of her motion, those parties who were at the scene of the incident and who could be identified have been deposed.  Defendants do not point to any other witnesses or evidence that may be crucial to defending this claim.

Therefore, because leave to amend should be freely given, and because the Court finds that justice so requires in this case, the Court will grant plaintiff's Motion to Amend, thereby allowing her to set forth a cause of action against Camp for bystander liability.  Accordingly, plaintiff shall file the Third Amended Complaint in the form attached to the motion within five (5) days from the date of entry of this Opinion, and shall serve the Third Amended Complaint in accordance with the Federal Rules of Civil Procedure.

## IV.  CONCLUSION

For the foregoing reasons, and those expressed in the Court's Oral Opinion issued on April 22, 2010, defendants' Motion for Summary Judgment is granted in part and denied in part.  With regard to plaintiff's Section 1983 claim and her claims of wrongful imprisonment and negligent bodily injury against the City, defendants' motion is denied.  Defendants' motion, however, is granted with regard to plaintiff's claims against the Camden Police Department, her claims against the City for use of

excessive force and assault and battery, and her claims against
Camp for wrongful imprisonment and negligent bodily injury.
Thus, those claims against the Camden Police Department, the
City, and Camp are dismissed.  Lastly, plaintiff's Motion to
Amend the Complaint is granted, and plaintiff is directed to file
and serve the Third Amended Complaint as stipulated in this
Opinion.  An Order consistent with this Opinion shall be entered.


DATED:  ___June 15, 2010___          ___/s/ NOEL L. HILLMAN___
At Camden, New Jersey                NOEL L. HILLMAN, U.S.D.J.